All rise. The evidence of the court's argument is now in session. The Honorable Justice Margaret Esquivel is deciding. Good morning, everyone. Please be seated. McKean v. Sessions All right. The attorneys that are going to present oral arguments, please, would you step up to the podium and identify yourselves for the record. Go ahead, attorney, please. Good morning, Your Honors. Yes, Robert Raymond for Plaintiff Appellees. Good morning, Mr. Raymond. Good morning, Your Honor. Karen DeGrand for the Defendant Appellees. Good morning, Mr. Grand. All right. Each side will have about 10 minutes to present arguments from that time for rebuttal. So with that, Mr. Raymond, you may begin. May it please the Court. Counsel. My name is Robert Raymond, along with Co-Counsel Timothy Borchard. I represent the Plaintiff Appellants, Deborah McKenna, Independent Administrator for the Estate of Diana Urcity. And, Your Honor, did you indicate there could be some time for rebuttal? Yes. We'll have about 10 minutes for your presentation. We are very reasonable here. We don't usually cut people off. And from that, you may also save some time for rebuttal. Understood. Before I get into the specifics of this case, the decision before you, Your Honor, today involves a privilege codified by the legislature regarding the mental health confidentiality Illinois citizens have thus far been guaranteed. From a public policy standpoint, protection of the privilege in keeping sensitive mental health information private serves the greater purpose of assuring Illinois patients their own mental health care will not be used against them and encourages honesty and transparency with providers, which keeps not only those seeking mental health care safe, but also the public at large. On the other hand, appellees wish to create additional exceptions for disclosure of mental health information and read the statute more narrowly than any Illinois case has to date. Counsel, what section are you citing? 10A3? 10A2? 10A1? Yes, Your Honor. I'm citing all the sections here. So, run with me for a minute here. 10A1 is if the plaintiff put her own mental condition as an element of the claim. Sort of like emotional distress, something like that. Correct? Not emotional distress, Your Honor, but the idea is correct. If there's a psychiatric claim or saying that the mental health services that were provided were deficient, fell below the standard of care, then yes. How does that apply in this case? It applies in this case because there is no mental health care at issue in this case. This is a case involving a failure to timely diagnose lung cancer. So, you're saying under any of these three provisions, there is no disclosure? That's what I'm saying. Okay. I'm sorry. Go ahead. I had other questions, but I'm going to take them. Okay. You're saying the privilege in the first section applies, the privilege in the second section applies, and then you're saying the privilege applies in the third section? I am, Your Honor. Okay. Yes. But, correct me if I'm wrong, A1 doesn't have to be alive? I don't think it says they have to be alive in the statute. However, A2 does specifically state if the patient is deceased. So, wouldn't that by implication mean they've got to be alive in A1? Not necessarily. No, I don't think that's the way that it reads, Your Honor. Okay. So, the privilege that you're asserting would most likely come under A2, correct? I think it would come under A1, A2, and A3. Okay. And that's, if you look into the minutia of the statute and the language that's there, when it talks about services, the definition of services in the statute is mental health services. And so, when we're looking at services and that being what's being called into question, it's the mental health services, not any other services. Okay. Okay. All right. Well, that's more particular to A3, isn't it? As far as services? Yeah. Yeah. I mean, the language specifically. I think what Justice Burke is saying is that this section in particular talks about for any injury or injury caused in the course of providing services to such recipients. Right, in the course of providing the services. And the therapist and other persons whose actions are alleged to have been the cause of injury from that therapy. In the course of providing the services. So, in the services being mental health services. Well, but if you're backing it up, it says of the recipients for injury caused in the course of providing services. Right. So, caused by providing mental health services. Yeah, and you're saying that this privilege applies here to your client. Well, that it has to be read under the statute. I mean, this is the exception. This is the exception. I think the language is causing us all a little confusion. Let's just let you talk for a while. Sure. Just to pick up where I left off. So, on the other hand, the penalties wish to create an additional exception for disclosure of mental health information and read the statute more narrowly than any Illinois case has to date. So, they're arguing for new law here. There's no case in any of the briefs that were provided to your honors that actually say, if mental health services are provided and they're not at issue in the complaint, that then mental health records should be produced in the case. If they're not at issue, if we're not saying there was mental health care that was deficient and it didn't cause any of the injuries, which it didn't in our case, then it shouldn't come in. And that's what we're saying. This is not discoverable. The statute provides this privilege and they can't get into it. What if somebody were a paranoid schizophrenic? And I'm not asserting that that would be the situation here at all. But they're a paranoid schizophrenic and they would have a lot of difficulty explaining to a doctor what their symptoms were, if it's increased or decreased. If they had mental incapacity to such an extent that it impinges on the doctor's ability to diagnose and treat. So, just to understand. I mean, just run with me for a minute.  Wouldn't that impact how a doctor does his job? And if we're saying that you've fallen below the standard of care, wouldn't it make sense to allow the doctor to assert, well, I couldn't get that information from her and if I did get that information, I would have ordered this business. Yeah. So, in the case, in your scenario, your hypothetical, there's an injury. The injury doesn't involve mental health care, but the patient has an issue communicating due to some mental health condition. Yes. Okay. And so, the doctor doesn't have the necessary information to then make some kind of a diagnosis. Right. So, because he doesn't make that diagnosis, the patient dies. So, in this scenario, we're saying, hey, the doctor couldn't rise to the standard of care that we would normally have in this situation because the patient was unable to bring the concerns to the forefront. Does that make sense? I think it does. And I think this is where we're kind of getting into the modern medicine aspect of things, right? Because now primary care doctors are providing substantial mental health care to their patients in this day and age. And if there's an issue with communication, I'm not a doctor, but I would assume that there would need to be some kind of a referral made to someone who is qualified to actually understand what's going on with the patient instead of, well, I didn't understand what the patient was saying, but I'll assume X, Y, and Z and then go along with the treatment. I think there would be a substantial... Well, that's kind of like what makes this maybe a case of first impression. Because here, from what I read, I don't know that there's any case where you had a primary care doctor also acting as a physician under a statute that makes them actually a mental health provider. And so this doctor has two different roles, right? Two different activities. And in the Rita case, which, you know, would certainly support your position, that was another treater, so to speak, or a doctor who was treating the patient for mental health services. Unlike this case where you have a doctor who's got two hats on. So we don't really have any case, I don't know, parties for violence with any, if there's any in other states. But, you know, I mean, I think that certainly makes this very new in terms of an issue where you have... In the Webb versus Quincy City sort of address an issue that I propose the court apply to this case is when there is this kind of discrepancy between psychologist-patient privilege and physician-patient privilege. The overriding principle is for the psychologist-patient privilege to take precedent. So what we can do is say for mental health reasons, we'll keep that out. But the doctor can certainly still rely on his records and everything he was doing as a primary care provider outside of the mental health, which is privilege. How would you summarize what the defense wants to do as far as their doctor and their hospital? It's a bit convoluted, I will say, because, and only because, we're only receiving arguments from attorneys about what they believe the doctor wants to assert. There's no foundation laid via an affidavit or anything from the defendant doctor himself saying, look, this is my theory. Well, should that have taken place in front of the trial judge? I believe so. I believe that there was motion practice on a protective order where an affidavit could have been procured and foundation for this argument could have been properly laid, but it never was. And so we're left here looking at citations either to the motion practice arguments from the attorneys themselves or no citations whatsoever and just looking at this assertion by the defense that, well, her weight loss, we're going to argue that her weight loss was caused by mental health reasons, not by cancer. Well, the defendant doctor testified, right? There was a deposition. He did not. I thought there was a deposition. He did not testify. Oh, there was a deposition? No. Okay. So what were those objections made then? Those were made during the independent administrator's deposition where she was being asked by defense counsel about mental health. Oh, I see. Okay, so I misspoke. Of her mother. So there's really nothing in this record where the doctor was suggesting what he wanted to testify to vis-a-vis his treatment of this patient because he treated the patient as a therapist under the statute and also as her primary care physician. Right. Nothing foundational, no affidavit, just statements by the attorneys and the motion practice. Correct. So the defendants here are arguing under the doctrine of fundamental fairness that the records should be provided, right? And they cite the DC versus SA, which also the plaintiff put their medical condition into issue. So how do you distinguish that from this case? I would say the DC versus SA, I mean, that's a completely different fact pattern. And, you know, more so in this case the mental health was put in issue because it involves a patient who had recently, you know, around the same time as the injury occurred where he was struck by a car as a pedestrian, was hospitalized for suicidal ideation. And so logically the defense would say, well, what was his state of mind at the time of this occurrence? People can sometimes step into traffic if they have suicidal ideations. Under fundamental fairness, the court said, well, you know, that's a really good point, although you have this overriding principle of mental health confidentiality under the statute and the privilege. Here, his mental state, because he has a duty for his own well-being. And if you're saying he exercised his duty properly, then the defense has the ability to question that and they really limited in that case the mental health records that they were allowed to actually go after. And it was only surrounding the time in order to explain what the patient's state of mind was at the time of the accident. And so distinguish that from here, I mean, here we have a woman who smoked three and a half packs of cigarettes a day. She had COPD. She was on supplemental oxygen. She had been hospitalized numerous times for shortness of breath. And she had seen a primary care doctor treating, you know, overseeing all of that preliminary care that she's having. And also, after her husband died, she started to struggle a little bit with mental health. That's what the records show. And the records just show diagnosis and they show medication. How many years are we talking then about this mental health situation? She started treatment with this particular group in 2008 and she passed away in December of 2016. No, but you said that there had been this history of pulmonary disease and she had been a lifetime smoker, a smoker for how many years? But what I'm saying is when did the mental health care begin? Because that other history was going back prior through another doctor. This doctor took on the primary after another doctor had earlier done so. Correct, correct. So how, you know, when did the mental health, you said it happened where she started beginning treatment after her husband died. So when was that in relation to the history that had already been well established as far as her? Yeah, I don't have a precise date for when the husband passed away, Your Honor, unfortunately. I do have the records and I can search through those and try and let you know in rebuttal. But it was after, you know, these pulmonary issues had already begun. And like Your Honor correctly said, this Dr. Rattle, who is the appellee here, he began treating approximately two years before she was diagnosed. He took over from his partner, Dr. Kavor, who had been treated from 2008 to 2014. You know, going back to the D.C. case, which is a Supreme Court decision. Yes. There was a limited disclosure, wasn't there? Limited, yes. Yeah. Do you recall what it was or how the Supreme Court worked that out? Just around that time of the accident itself. So that admission where the patient had the suicidal ideation. Yeah. Had there been previous mental health before that issues with that same plaintiff? You know, I don't recall. All right. Well, I've done a series of arguments. It's just as Rachel pointed out. They are arguing under this fundamental fairness, you know, issue or claim, rather. And also under the fundamental fairness, the big factor there is does the defense prevail if they're allowed to bring in these records, this information? And we're talking about, you know, the connection, which isn't actually apparent in the records. Okay? So the records just say she's treated with these medications for this condition. It doesn't say, you know, I, Dr. Rao, believe she's losing weight because of any sort of medication she's on or any sort of mental health condition. It doesn't say that. So it's kind of outside of the records themselves. But do they prevail in a case with a woman with all of these pulmonary issues, multiple hospitalizations, being followed up by a pulmonologist on a regular basis, if they just assume that the unexplained weight loss, where she's not trying to lose weight, she's lost 40 pounds, is due to a mental health issue? I think that's a stretch. I think it's a stretch. I don't think a reasonable juror would find that they would prevail just on that fact alone. And so I think the statute overrides fundamental fairness in this case. Okay. So, you know, I know we've gone over some of these facts. I'd just like to go over some more. So on November 8, 2016, at the age of 76, Diane Ercity was diagnosed with advanced metastatic lung cancer, Stage 4, and died less than 40 days later. Diane had been a heavy smoker in the past. The records indicate she smoked approximately three and a half packs of cigarettes a day for multiple decades before quitting. She was diagnosed with COPD and BOOP, a form of chronic pneumonia. So her lungs were filling up with fluid. Required supplemental oxygen was hospitalized multiple times due to difficulties breathing and chest pain. Dr. Rao began treating in October 2014. His practice, Elk Grove Medical Associates, who's also an appellee, had treated since 2008, and Diane's care had previously been provided primary care by Dr. Kabur. And the records indicate that after Diane's husband passed away, her primary care physician began providing some mental health services while also assisting to coordinate her pulmonary health. And that brings us up into 2016. And also with the fundamental fairness, I'll go back to it, defense, or reason for disclosure of this information, it's the defense's theory in this case, the pulmonologist that we took, defendant, because his deposition has proceeded, I don't know, that was not provided, I don't think, or at least not argued. It was their position that as late as July of 2016, so four months before she was diagnosed with this advanced metastatic cancer, the cancer was undetectable. Couldn't find it. And that's also the position of Dr. Glick, who's Dr. Rao's partner. He deferred to the pulmonologist. He said, if the pulmonologist says that, then that's what I believe too. And so if that's the case, then her weight loss doesn't matter, because they don't believe the weight loss would have been connected to her cancer diagnosis anyways. And so the whole reason that we're here is that they're trying to say her weight loss was connected to her mental health, that's why I wasn't suspecting cancer. Well, even if it wasn't connected to her mental health, they're not saying that her weight loss was due to cancer, even in retrospect. So there is no reason under fundamental fairness for the mental health records to come in. They can simply say, I didn't think it was because of cancer. So can Dr. Rao testify, other than having these unredacted records, to the treatment that was provided? Or does he need these in some way or fashion or form to be able to testify to his treatment? We propose redacting the mental health medications and the conditions that she was diagnosed with. Other than that, his records are what his records are. And the past records are what they are. And I think under the trial court's order, not only is Dr. Rao being permitted to testify about his own eight visits from 2014 to 2016, but also all of Dr. Kavor's visits from 2008 to 2014 as well, where he started treating her for mental health reasons. And so that also kind of goes more broad than just using his own records. Then he's using another doctor's records too, and his experts, according to the order of the trial court. Were there experts proposed by the defense? Not yet, Your Honor. There's still an initial party discovery. Anything you want to add at this time? Yeah, just every case that was cited here where there was disclosure of mental health information, it's where psychiatric care was put at issue. Here psychiatric care is not being put at issue. Dr. Rao's care as a primary care physician is being put at issue. So the way that I find is best to explain it is if the exact same care Dr. Rao was giving, which we're not critical of from a mental health perspective, instead was referred out to a psychologist or psychiatrist, the onus would not be on that psychologist or psychiatrist to do a workup for cancer. So as a primary care physician, he should have suspected that there was a need to do additional testing, radiology testing, CT scans, et cetera, in order to test the cancer early, certainly passing away 40 days after your cancer is found. How did that come about again? I think you mentioned it earlier, and I apologize. She was hospitalized after becoming injured, and then the workup was done and the cancer was found. So not referred to by one of her other physicians. Did your experts conclude that this would have been something that could have been diagnosed much, much earlier? We haven't done expert discovery yet. I thought there was some. What about the proposed physicians that verified that you had an illegitimate cancer? The 2622 report? Yes. Yes. So, yeah, they were saying that there was a meritorious basis to bring a case against Dr. Rao, that from an earlier point in time he should have suspected that this patient could have cancer and just ordered the workup for it. And that's... Weren't there three physicians that you had named or not? What am I confusing? Three different defendants? Yeah. Yes. So there's also Dr. Rao's partner that I mentioned earlier, Dr. Glick, who provided care on one or two occasions after Dr. Kavor had left the practice. And there was also the pulmonologist, Dr. Pantano, who was following the patient as well. So they're all defendants in the case. And then it's our assertion in the pleadings that they should have at least done a workup to try and find this cancer, caught it earlier. Had they done that, more likely than not, the patient would have survived. And when you look at the allegations of the complaint, I won't go through them one by one, but they were on pages 12 and 13 of plaintiff's opening brief. Nothing in there is critical of psychiatric care. So we're not putting the mental health care at issue in the case. All right. To sum it up, aren't you saying that this Section 10A3 is really only designed to allow the privilege to be overcome when the treatment arises out of the course of mental health treatment? I am, Your Honor. Yes. All right. Yes. And the Quincy Court commented, you know, it's a 1966 case. They saw stuff like this coming back then, which is admirable. But what they say is there will always be creative arguments. There will always be ways to make these things relevant. But if it's not put at issue in the complaint, here we have a statutory privilege. It becomes more of a sideshow, more of something that can prejudice the plaintiff. And rather than, they used some colorful language, but rather than mess around in the sideshow, we should be paying attention to what actually happened here with the care and treatment, which was the delay in diagnosis of lung cancer. And that's what the case should be about. And nowhere in any of our allegations are we saying that there was any deficient mental health treatment. If, as Your Honor mentioned Rita before, I mentioned Quincy, and more recently this court looked at the Sparger decision in 2019. In Rita and in Sparger, there were actual brain injuries that were being alleged in the complaint. And the court still said it's a brain injury, but it's not a psychiatric injury. So you haven't put mental health at issue. Putting it at issue is kind of the big concern when it comes to overcoming the privilege. Kind of like controlling a client's privilege. The patient pulls the privilege. The client pulls the privilege. Not the doctor. The doctor can't make it relevant. Unless there's an exception. We're going to have to see what actually the defense position is. I don't want to speak for anyone, but it seems that... Do you think that the doctor should not be allowed to argue that the mental health issues that he had treated her for prevented him from actually or steered him off course as far as diagnosing or suggesting these other tests? Yeah, under the privilege that exists, yes, I do. And I think if we kind of open the door here, we're going to be opening Pandora's box into this becoming an issue any time a primary care doctor is to provide... And would it be that... Would the doctor say, well, weight loss was a symptom of her mental health issues? I mean, is there anything else that you think that they would try to argue other than, well, she had significant weight loss, and that, to me, was a result of her mental health issues? And is that going to be the argument that, well, then I didn't diagnose or didn't order these tests because I attributed weight loss? Are there any other things that the doctor was going to say? Other than her weight loss, is there anything else you would say that made him think that there was no need for these other tests? Primarily, that's what I'm reading. I'm also seeing what came up in their brief was something about confusion.  I mean, she's, you know, advancing in age and has health problems with oxygen and everything. But she was starting to have confusion issues. I saw that in their brief. I'm not sure how that's going to be connected. I suspect they will try and do that. I don't know. We're going to have to ask the defense. What is it that they want to argue or have the doctor argue in his defense? So, we'll give you some time for rebuttal. Thank you, Adam. Thank you, Adam. Good morning. Good morning, Your Honor. Again, Karen DeGrand on behalf of the appellees, the defendant appellees. May it please the court, counsel. The argument that I just heard displays multiple misconceptions about the statute and about the record. So, where I'd like to start is a couple of big picture points. The at-issue exception that the plaintiffs are attempting to convince this court is required for each of the 12 exceptions that are included in Section 10A of the Mental Health Act, that each of them requires an at-issue waiver. And that is simply not the case. When the court looks at the statute. But aren't you agreeing that they have not, the plaintiff hasn't made her mental health at-issue? Well, I think it's close. I think it's close. And how is it close? So, here's when we look at A2. Yes. And that's the section that applies, not A1, because A1 would only be if the recipient were making the arguments herself. But where the plaintiff is saying that you, Dr. Rao, are negligent in your care of this patient. And where you see that entry after entry of Dr. Rao's care of the patient involved responding to mental health issues as well as other physical issues. But refresh my memory. I think that in the brief they set out the allegations and the complaints. And tell us which you really believe suggests that there was negligent care as far as mental health treatment. But it doesn't have, there doesn't have to be an allegation of negligent care to mental health care. And I would agree with you. But then tell us where in those allegations you would suggest that that can be teased out somehow. Well, I would say that the best example of that is contained in the consultant's report that contains the complaint. The allegations themselves involve, I can give you the specific state. Who's consultant? See, this is the plaintiff's 262 report. And it relies on the very entries that plaintiff now is saying should be redacted. And that Dr. Rao should not be able to use to defend himself. Okay. Here's the consensus of consultant's report that you think raises. Absolutely. Please tell us because I was looking at the allegations in the complaint. I don't see anything in the complaint from the allegations that I read. I think it would suggest that there was negligence in the mental health treatment. It's implicit, Your Honor, because that was the, it can't be for the plaintiff to say, Dr. Rao, you're negligent because you did not, your actions did not take the steps to diagnose lung cancer. That in your care of this patient, you missed the symptoms of lung cancer that should have prompted you to send the patient for testing and so forth. But aren't the allegations made as a primary care physician that you didn't order this test? You didn't order that test? That, you know, she ended up dying from cancer because you didn't order specific tests that relate to a primary care physician's obligations? But, Your Honor, Dr. Rao has to be able to rely on his own records to defend his case. Okay. Just kind of refresh us as to what you told the trial judge, as to what your doctor wanted to say in his defense. That because she had a significant weight loss, I missed ordering these tests for cancer? Do you want to say that? Okay. So, Your Honor, let me, can I just, and that's part of it. But it's not just one specific weight loss didn't prompt me for X reason. It's the entirety of his records. But there's a glitch in the record because the plaintiff, does he want to say that because she was suffering from depression or anxiety? And there's a big dispute. The daughter says that she was suffering from anxiety, but doesn't, she says that my mother was never suffering from depression. Right. But the records, and the records that are in the Apollo record show that she referred at visit after visit, the daughter who went with the mother. So does the doctor want to say, and they criticize you because they say that these things are not located anywhere, that you're making allegations. But so does the doctor want to say, for example, well, this patient, you know, I was treating her in two capacities, primary and mental health therapist. Absolutely. And that because she suffered from depression, because she had a lot of, she lost weight, I did not order these tests. Is that what he wants to say? Your Honor, yes. And let me just direct you to the pages of the record. And would another doctor say that that was okay, that that would be, that would not be negligent because if you're treating a patient for two different things that, you know, you have to separate them, and the doctor, you know, wasn't negligent in determining or suggesting these tests because he had all these other concerns that made him not do all these other tests. Okay. So there's, I think there's another question, Your Honor. I will say. I'm sorry? This is a very complicated case. It does seem to be one of first impression because you have a doctor who's doing both. And we don't have a case like that. You know what I mean? I'm taking this all seriously. Okay. And I understand because the case, because plaintiff relies on case after case that pertains to a section of the statute that is inapplicable here, A1. This isn't an ad issue. Our primary position here is this, Your Honor, if I can do a little statutory summary here. What we have here is the judge's ruling that Dr. Rao should not be barred from relying on his own medical records to defend himself in this case. The plaintiff is absolutely wrong in saying that we're trying to create new law. We're trying to rewrite the statute. We are absolutely within the statute. And our primary argument is Section 3. And I think Justice Brooks was getting into this. This isn't an A1. This isn't an A2. It could be an A2, but really primarily our argument is A3. And as Justice Reyes mentioned, we also mentioned the fundamental fairness. But our primary argument is A3. So with the plaintiff, if we look at it, their interpretation is, and you can tell me why it's wrong. Here's the operative language. In the event of a claim made for injury caused in the course of providing services to such recipient, the therapist or other person, whose actions are alleged to have been the cause of injury, may disclose. They are arguing that this is an exception, right? And you believe it is an exception. Sure. But that this exception is narrowly tailored to mental health treatment, not general care. That's what they're arguing. They're wrong. And let me tell you now why. Tell us why. One, it is specifically narrowly tailored for providing that the complaint, the allegations, have to be relating to injury that's caused in giving that mental health treatment, not just the general umbrella of all kinds of medical treatment that doctors and therapists do. Okay. So one of the ways that I think that counsel has confused the issue is by suggesting that A3 involves an at issue component. It does not. I think you're going beyond what I just said. I don't think they're actually arguing that. Okay. Well, good, because that would be wrong. So here's what the statute says, and here's the crux of our argument. And I'm looking, this is precisely from A3. We're not adding anything to it or anything of that nature. It's a physician, a therapist, and the statute defines physicians within, physicians are within that definition. Such as Dr. Rao, who is the subject of a claim or action by the beneficiary of a recipient of services. Okay. So they're qualified there. Whose actions, not whose mental health services, but whose actions allegedly cause an injury, and the injury is relating back to the earlier injury. Injury caused in the course of providing services to such recipients. And these services that they're referring to are mental health services. But it says whose actions. It doesn't limit the doctor to use the records that are precisely for mental health services. It says whose actions. It doesn't say that it has to be a psychiatric malpractice action. No, it doesn't say that. It does not say that. And it says that the physician who is providing services, whose actions. And that's exactly what's in the complaint. They've got allegations that Dr. Rao's actions caused the injury. And there is nothing in that statute, I should say, in that section of the statute, that says the injury has to be a psychological injury. And that the plaintiff is trying to- No, it's only about injuries caused in the course of providing services. And you're trying to say now that this isn't really about mental health services. It's just any kind of services in the world. No. Is this supposed to be a privilege for mental health services? It is to not allow the general disclosure of mental health records to the world. This is an exception. It's an exception to that rule. Their argument is that this exception is a very limited and narrow one. And that it's for an injury caused in providing those mental health services. And you're saying that the doctors-that in providing the services, your doctors should be allowed to say that my mental health services derailed me, so to speak. And I'm using-pardon my language. I understand. My provision of the mental health services are what resulted in-I didn't order these tests because I was treating her for these things-weight loss, depression, anxiety. And those things, the weight loss and the way she was presenting to me, indicated there were no other health issues. But at the same time, she's a doctor. She's a primary care physician. And this is a very complicated case. It still fits within the statute, Your Honor. It still fits within the statute because it doesn't say whose provision of mental health services. It says whose actions. And it contemplates this-precisely this kind of a situation. Okay. Then tell us why that Supreme Court case is being relied on. Rhea. Am I saying it wrong? Maybe that's mixed. Rhea. Rhea. Before we move off this for a second, would your argument change if Dr. Dow were not seeking his own medical records but were seeking a psychiatrist's records? We wouldn't be involved in this section. That's the A-1 and A-2. Okay. That's where it's contemplating that a situation where, you know, somebody is-let's say-I think this is- Let's say they're A-2. Let's say they're A-2. So A-2 encompasses a situation like what you're describing, Your Honor, which is your health care caused my client to have depression and whatever kind of mental health. And we would say, Oh, well, then we get to under A-2. We get to bring in these other people's records. That's not the primary argument we're making to the court. We're saying our doctor's records, he just used his records. Let me just explain, you know, to give the perspective here. This is health care between October 27, 2014, and October 25, 2016. In entry after entry, the Dr. Rao is treating this patient for lack of a memory, for the daughter's reports of, I think, you know, depression. It's noted in entry after entry, and this is in-it's not cited in the plaintiff's brief, but it's in the CS-74-75, CS-77-78, CS-81-82. I mean, I think maybe one of the best examples of the focus, Dr. Rao's focus, and what is being involved, what he is presented with, is the entry for July 20, 2016, which appears at CS-252-53, and the daughter is concerned. This is from the medical record. It's in our records. The daughter is concerned that the patient is getting depressed. Many cognitive tests is abnormal. You know, results from neuropsychiatric testing for depression increases dose of antidepressant and stress. So to put this in perspective, and this is why A3 fits this case so well, what exactly is my trial counsel going to have her client testify to when the plaintiff, for example, the plaintiff's consultant says, well, I looked at these dates of the records, so these very records that they're asking us to not be able to use in defense were relied on by the doctor who- And what did they say? You were going to say that earlier. Okay, so here's what it said. The doctor, the consultant report says that this physician looked at all of these records of Dr. Rao, and so that person has had these records, and this appears at page 85 of the record. And, you know, Dr. Rao saw the patient at his office on July 20th, and that's the one that I just gave the citation to, and at that visit he mentioned her weight, and there's no documentation of a lung examination or her current oxygen saturation. If we can't talk about all these other things- Okay, so the consultant is pointing out that there were no tests for her lungs and her lung saturation? On the very day where Dr. Rao was treating her for all of those- So the consultant's basically saying that there should have been those things that day? And our records explain why, Your Honor. What does it explain? So what is Ms. Downer supposed to do with her- Well, we can't, at this point, because of this appeal, we can't give the records to our experts. Would either of you two ever think that this was kind of a premature, early on, ruling on something that really hadn't been vetted? No, and I'll tell you why, Your Honor, because- I wonder. Okay, well, here's my position, Your Honor. The plaintiff raised the statute, and we are trying to be very respectful of that. The plaintiff raised the statute after the plaintiff's deposition went, and, you know, there was discussion about, well, depression and so on, and then after that deposition, before Dr. Rao's deposition, which hasn't gone, because of these very objections, his deposition hasn't gone, there's a letter that says, well, this is- So what was the trial court really using as a slate to make a determination when your doctor hadn't been deposed? The medical records, Your Honor, and let me- But that- I mean, I'm not sure I understand what- I still- I'm not sure I understand what is the defense that you wish to present, and was that enunciated to the trial judge? I mean, I suppose it was, in opposition to their motion, but- I wonder if this whole thing was done prematurely when you have one witness who's the daughter of the patient, right? What are you saying? You can't even testify to these things in our deposition. What- How- Our hands are tied. Your Honor, I know. I'm just saying. I just wonder if this was something that was really vetted when you had one deposition. But, Your Honor, let me say this. There was no objection until this reprisal was filed to any kind of foundation or anything like that. That's brand new. And that objection was not made to the trial court. And that- We've never had the opportunity to address it. I'm addressing it now. But let me- What is Dr. Rao supposed to say when there's an allegation, as in this 262 report, that on that day you were negligent because you didn't do this and that and the other- And what is the role of the doctor's response to that? The doctor's response would be, here's everything that I was paying attention to, and here is what I was doing to care for my patient. But according to plaintiff, he can't say anything yet. What is he supposed to say? Because what we have here is basically cutting our defense out from us because we can't rely on a medical record. So how do you- We can't rely on a portion of the medical record. But it's not divided out, though, Your Honor. That's a whole part of it here. And that's his defense. His defense is the medical record. And that's exactly what the judge said. The judge looked at it three times and said, no, he's got to be able to have that. And if you look at A3, A3- And this goes to the prematurity argument that- or not argument, I'm sorry, Your Honor, the prematurity question that the court just asked. A3 says you can use this to develop your defense. It's not premature because we haven't had the opportunity yet to do it because they're asserting that the act prevents us from using the records to rely on for defense, that we can't give the records to our expert, although the plaintiff has already given those records to their consultant. Right. And then that goes to Justice McBride's argument that this is premature. Whether or not this comes in at trial is so far down the road that that could be a whole different issue. When you're formulating your defense, why couldn't you have access to those records and use them for your defense? Your Honor, according to the plaintiff, it has to be redacted, and we have to pretend that that care never occurred and that we have to pretend- and so how does Dr. Roth come into his deposition if he can't talk about his actual care? There's no dividing it that way. That's why I'm emphasizing these sections of the medical record that are in the record on appeal, and one of the problems- Could you just summarize for us what is your defense to the negligence allegations, in a nutshell, that involve the mental health records? Could you just try to give us that? Your Honor, the defenses that Dr. Rao was caring for this patient and responding to all of these symptoms that are being reported to him and is referring her for care and is referring her for mental health care and is doing testing and is giving medication that involves that- And the care that this mental health care- What? How does the mental health care that he was giving relate to the negligence allegations about his medical care as a physician? It relates to it, to the allegations that the plaintiff is saying, you did not properly diagnose this patient, you didn't properly care for this patient- And he did a number of tests, okay? We understand their allegations, but what is your defense that how this mental health treatment- against the allegations of not ordering certain tests? Just give us something. I don't understand it. Okay, so, Your Honor- I'm sorry, I'm sorry to interrupt the court. No, it's okay. We're both being emphatic here, I think. But the weight loss allegations, that's a key to their position, is what that is- And Dr. Rao would testify, too, and he hasn't had the opportunity to testify yet because we haven't had this worked out so that he can rely on his records and say weight loss is associated with the mental health issues. Sure, but don't they allege all this history about her being a 30-year smoker? Maybe I'm exaggerating the years. She had COPD, she had all these signs, what have you, that would indicate that one cancer test might be something given every six months. Well, that is one of the things that they're arguing, but we have, and our response has to be able to-we can't just, like, cut out all of the care. Cut out a significant portion of the care and say, well, so he considered weight loss related solely to her mental health. So he considered what else related solely to her mental health. So he considered all these other things. And that, some expert, or he would say that, in my opinion, that is not medical negligence because I was looking at everything that, to me, presented as strictly mental health issues, nothing that would ever suggest to me that I should have ordered these tests. Is that the defense? Well, I mean, he hasn't testified yet. This whole thing seems so premature to me. This order came out of a deposition of a daughter of the plaintiff. Isn't that what this all was? The ruling came out after that one deposition. It came out after that deposition, after the plaintiff sought a protective order. I mean, this is a- I understand. I understand. And after you responded, and did you ask the court to delay, or did you offer something of proof? I mean, I'm still trying to grasp what your defense is, is that the mental health treatment that I gave outweighed any thoughts of doing other tests or something. Or that these things-I'm not trying to, you know- I don't want to speak for the lawyers, but I'm just trying to grasp how you're the mental health treatment in some way that he would say, in my opinion, I wasn't negligent, or another expert would say he wasn't negligent because he had all these other features in front of him, and so that's why he didn't order those tests. That's it. And there's going to be testimony that is presenting that in a way that is getting into those issues in a much more detailed way, but you can't cut out-and I guess this is really the crux of our position- But one of the complaints that the plaintiff has made is that all of the things in your brief are things you're saying, but they were never really testified to, or they weren't in a deposition, or they're being pulled out of whatever. Well, you must have answered the complaint. And we also-we answered interrogatories where there was certification of the doctor relying on his medical records, but the point is-and this is what A3 contemplates, Your Honor. Well, they have to make an argument about it. Well, they want to. This action has to arise out of the course of providing mental health services, and they're specifically saying that this exception to the privilege does not apply because this action does not arise out of-they're never complaining or suggesting that your client, because of the mental health treatment services he gave, caused her injury. They're saying that's absolutely not their position. Maybe I'm misspeaking, but I think that's what their argument is. I think that's what their argument is. And there's an argument to be made that this section of the statute could be limited to those claims that are brought about as a result of mental health treatment causing an injury. But that's not what the statute says, Your Honor. Okay. And that's what our position is. It's not that-you know, the legislature knows how to say things like malpractice and psychological injury, and then those words don't appear in A3. Why isn't this case like Rita, our EVA? Rita is an A1 situation. Okay. And, yeah, it is a 1A1 case. And it's not-it just doesn't-it's apples and oranges. We've got 12 exceptions. We don't have-you know, you don't superimpose A1 onto all of the other sections of Section- or all of the other subsections of Section 10. It seems to me that the trial court was doing the right thing here, not just in recognizing what the court said. How in the world can Dr. Rao defend himself without being able to rely on his medical records? And I think this goes-and I hope that I'm answering your question to some extent, Justice McBride. But the point-the whole point of A3 is that it contemplates that the records of that caregiver, of that physician, can be used to present a defense against claims. What claims? Claims that arrive out of the caregiver's actions. It doesn't have to be only, rarely, with respect to mental health. And that's what the statute says. And that's why we're not coming up with something where we're trying to create some sort of new law. It's right out of the statute. I mean, it is-it's about mental health records. And it says, for injury caused in the course of providing services. Mental health-we're talking about mental health services. We're not talking about general medical care. We're talking about mental health services. And what this-that's what this privilege is all about. And it also says-and have been the cause of the injury. And they're talking about, I think, mental health injury. That's certainly one way- But it doesn't say mental health injury, Your Honor. No, but it's talking about the whole privileges for mental health records, not for any other kind of physical care. Right? It's talking about those things privileged. I'm sorry. I mean, certainly you can interpret this to be that if it's an injury that the plaintiff is saying that this person has killed themselves because they weren't given the right medications during the course of their mental health treatment. I mean, that would certainly apply here. I mean, they have a valid argument. You're saying this exception does not prevent the attacker from testifying. It does not. And he's entitled to testify to his records. Otherwise-and this is where the fundamental experience exception comes in. You know, the-this case shares the unique aspects of the D.C. v. S.A. case. Hounsoul told the court that the D.C. case involved a finding of that the fear was at issue. It was actually the other way around. The opposite was true. The D.C. case found that, no, A-1, the requirements of A-1 were not satisfied. But we think that this is such a-this is a type of situation that's unique. And so we're going to create an exception, and that is where the aspects of the records pertain to a liability defense. Most of these cases, these A-1 cases, are fighting over the issue of is the care-does the negligence result in an injury that is a mental health injury? I'm going to try to interrupt you for a second. Sure. The facts in D.C. were that there was at least an indication in the evidence that was presented that the person who was involved was attempting to commit suicide because of mental health issues, right? That was not in the plaintiff's-the plaintiff did not allege that at all. No, that's what the Supreme Court and their finding-that's what they put in the case. So-and that's when they drew up the exception. They said, well, in that limited scenario, we're going to allow the records to be utilized, even though they put the mental condition into issue. So here we have a situation where you have someone who's been smoking for years, right, to go into a doctor. So how would her mental condition relate to that? There's no evidence here so far in the record to indicate that that one had to do with the other. Well, Your Honor, at this point, we're not in a position where we have to prove that our- We're not asking you to prove, but to draw some type of a link. Well, the link is this, Your Honor. The link to D.C. is this. Unlike those other cases that talk about, did it result in a psychological injury or whatever, and is that-how is that issue, that's not what we're talking about here. We're talking about, in D.C. and in our case, an aspect of the mental health records that potentially is a defense to the entire case, not just a defense to certain damage issues. So in our situation, it's a defense to the standard of care allegation. You were negligent because on these dates, you didn't determine that there-that you didn't recognize these signs as signs of lung cancer. And he wants to say why he didn't. And he wants to say why he didn't. I don't want to cut you off, but we have other cases. No, I think we're now beginning to understand both sides rather adequately, but we'll-if you want to sum up. I will sum up with this comment, and it goes to the entire case, but it does go specifically to the fundamental fairness. One of the fundamental fairness criteria is the person asserting the act, exploiting the act. And I think that's exactly the case here. When you have a party that is using the very records, including the entries in the records that talk about mental health, they've been given to the consultant and said you were negligent because you didn't do this at those office visits, and then now wants to pull the rug out from underneath us and say you don't get to rely on those records. You don't get to talk about your treatment. You just get to stand there and go like this when somebody asks you what you did on October 27th, 2014. That is not what's contemplated by this statute. And the court was absolutely right. It fits under fundamental fairness, but I think very clearly under H-3. So I have a question. At trial, if this were to occur, okay, then having to open the door, they've opened up the door, and then you could come in and present the contrary evidence. But what about Rule 213? We have to have our opinions and all that has to be disclosed beforehand. Then we're barred under Rule 213. So that's the problem. And H-3 really does contemplate being able to use this information in the course of discovery as we prepare our defense. Thank you so much for listening to me. I appreciate being back in court in person. So do we. We have to ask the court to affirm the trial court ruling. Thank you. So, Raymond, we're going to let you be brief. And I want to kind of go to the substantial justice or the interest of justice. Is there something really premature about this in terms of the court sort of cutting off at the very beginning the ability of the doctor to present a defense, whether you like the defense or you think it's, you know, not right or you think it's, you know. The fact that the doctor wants to say that he was treating his patient for not only primary medical care, but he was also acting as a therapist under the statute. Is there something unfair about not letting him say that I had, you know, I had all these records in front of me. And, yes, you know, you can cross-examine him about this history, this significant history. But is there something unfair about at least letting him have a deposition and say that these were the reasons that I didn't order these tests, because these other things indicated to me that they were symptoms of this mental health that I was treating him for. It seems a touch to be an advisory opinion. So I will agree with you there, Your Honor. I think when it comes down to it. You mean the trial court entered an advisory opinion? Just, you know, that going forward, how are we going to deal with this issue? Well, right now, the judge has made a ruling. And it's saying put these things out. Isn't that interlocutory? Can't that be revisited at any time? Can't you make motions at the time, you know, well before trial to say, you know, this should not be allowed? The issue is the plethora of case law about waiver of a privilege. And if... But we don't have this new, we don't have this new situation. What case have you cited where the doctor, who was the treating physician, the primary care doctor, was also the mental health therapist and is working on a bitter slate? Right. Neither of us have cited a case where that is. I know. So I'm just saying this isn't really, you know, this is new. It's a new area. And the other case, you know, the other case is there is a one where this doctor was wearing two hats all the time. Right. I agree. And I think what really highlights this, though, Your Honor must have asked the question of counsel five or six times before you got an answer, how in the world is this even relevant to their defense? And I think eventually it was, well, the weight loss. He was thinking that the signs and symptoms of the weight loss were related to a mental health condition, medication, what have you, and ends up making a referral out to somebody else to start managing it. Right? Is that what he did? He did at the very end. And then that was when the other tests were conducted and there was a diagnosis of the lung cancer. Correct. Correct. And so, you know, looking again at this. Will somebody be allowed to at least say that? That, you know, this is what I did, and then I refer to that? I mean, I don't know. When it comes to a statutory privilege, I think we have to be very careful about what gets said. Yes. And what we allow to be said on our client's behalf. And so that's the purpose of all of this. Can I sort of narrowly tailor this? Or was it more like an outright ban? This doctor can't testify about it. No other doctors can look at this or testify about it. I mean, it's a really broad. Well, do you see what I'm saying? I mean, it was an out of order. Because the first order that we got, it said all of this is going to be allowed into evidence. And then we brought a motion to reconsider, and the judge kind of walked it back. We needed an additional clarification. And then he ended up, the trial judge ended up saying, well, Dr. Rao can review this. Dr. Rao can testify about it. His records and EGMA's records can be produced to everyone unredacted. And no other defendant in the case can have records with the mental health diagnosis with any of the mental health treatment. So it was an out of order. Why is there some people can talk about it, some people can't? Particularly when what ends up happening in all practicality in our cases is there's a bunch of experts, and the defense adopts everyone's experts. So is anyone really being handcuffed when it comes to being able to talk about mental health? No, they're not. It's kind of the olive cart blanche. It's going to become a big part of our case. Whether it's to, you know, explain what her signs and symptoms were, whether it's eventually going to be argued in some kind of a reduction of damages, what's her loss of life if she's this really depressed and anxious person? Do you really, does that subtract from our eventual damages in the case? I mean, these are all valid concerns. And we, you know, represent the independent administrator, who's her daughter, who want all this stuff out in the open. And here we have an actual statute which says that these records, that this information is to be confidential. We have a failure to diagnose lung cancer case, and her mental health is being injected into it. But what about the argument that you're using the act as a sword and a shield because you're providing it to your consultants, but at the same time they're not going to get to bring anything in about it? I tell you, it was news to me that somehow counsel knows the exact records, whether redacted or not, that I sent to my consultant. It's news to me. I don't know how they would know that one way or another. They don't even know the identity of my consultant because they're protected by a different privilege and confidentiality. But didn't she, doesn't counsel have the consulting report that you filed with the court? You have to file that. They have to see that. And I think what she was telling us was something that was tendered, not something that she came up with. Yeah, the report. So after a review of the records in the case, the consultant creates a report which says we have a meritorious basis to bring a lawsuit. And so, I'm sorry, so what does the report say? It says she was losing weight. Okay. What does that have to do with mental health? Well, I think. So there's nothing in there about mental health in the consultant's report? It's news to me that there is. No mental health diagnoses are in the report. The fact that she was losing weight is highlighted because that's a sign and symptom of cancer. But can it also be a sign and symptom of the depression or anxiety that the doctor said she was suffering from and her some inability to be coherent all the time? You know, in theory, maybe. We don't have any testimony in the case about that. All right. Well, we really think this is a very important case. We're glad that you were here. We're glad that the tennis council is here. And hopefully we'll have a decision, you know, sometime in the future that will, you know, be fair and just for everybody. So, thank you. Thank you, Your Honor. I mean, if you want to go further to sum up, please do. Yes. I think Your Honor's questioning regarding Section 3 was directly on point. When it talks about the injury, it's mentioning the injury at the beginning of the section having to do with in the course of providing services to the recipient, privileges held by the recipient. And just to close off and to end my argument, so in today's mental health climate, the way that things are going, should we favor the confidentiality or should we go further towards the exceptions? Leave that to you, Your Honors. Well, thank you. Thank you. Both of you for your arguments today. We'll take the case under assignment.